# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STEPHANIE ADCOCK,                      )
                                       )
                 Plaintiff,            )
                                       )
        v.                             )          1:25cv6
                                       )
DURHAM COUNTY,                         )
                                       )
                 Defendant.            )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the Court on Defendant Durham County's "Motion to Dismiss" (Docket Entry 9) (the "Dismissal Motion") and Plaintiff's "Motion for Leave to Amend the Original Complaint" (Docket Entry 14) (the "Amendment Motion"). For the reasons that follow, the Court should grant the Dismissal Motion and deny the Amendment Motion.

## BACKGROUND & FACTUAL ALLEGATIONS

Stephanie Adcock (the "Plaintiff") initiated the instant action pro se against Durham County under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12132-65 (the "ADA") and 42 U.S.C. § 1983 ("Section 1983"). (See Docket Entry 1 (the "Original Complaint") at 24-25.)[1] "[S]eek[ing a] preliminary injunction, . . . declaratory relief" (id. at 2), and "damages . . . in excess of three[-]million dollars" (id. at 26), the

---

[1] Docket Entry page citations utilize the CM/ECF footer's pagination.

Original Complaint (A) "concern[s] Durham County's inadequate drug testing policies, practices, and procedures that causes [sic] individuals to be subjected to discrimination in violation of the [ADA]" (id. at 1) and (B) "describes how [Durham] County is responsible for the repeated infringement of [Plaintiff's] right to procedural due process and for the intentional interference with the custody and companionship of [her] two minor children as a result of discrimination" (id. at 1-2).

As the basis for Plaintiff's ADA claim, the Original Complaint alleges that Durham County "withh[eld] confirmatory testing for disputed drug tests [ ] when Plaintiff's prescribed medications are known to interfere with the accuracy of preliminary tests, thereby failing to make reasonable modifications . . . to avoid discrimination[] and causing Plaintiff to be subjected to discrimination and denied [ ] equal benefits . . . ." (Id. at 24.) Specifically, the Original Complaint alleges that, while on "supervised probation" (id. at 4), Plaintiff tested positive for methamphetamine on three occasions between 2018 and 2020 (see id. at 4, 8) and contested those results on each occasion (see id. at 4, 8-9) as "false positives" (id. at 5) due to her "prescribed [ ] stimulant medication for the treatment of [attention deficit hyperactivity disorder, or] ADHD" (id. at 4). (See also id. at 3 (alleging, "other than occasional use of marijuana, . . .

2

[Plaintiff's] abstinen[ce] from all illicit drugs and drugs that have not been prescribed to [her] since 2013").)

According to the Original Complaint:

Plaintiff's probation officer "prepared a violation report concerning the [first positive] drug test" (id. at 6), for which "the judge imposed an 18-month extension of supervised probation and mandated [Plaintiff's] participation in [d]rug [c]ourt" (id.), which Plaintiff "could not [ ] appeal[]" (id. at 7).  "Following a second violation report . . . regarding [a] second false positive drug test, [Plaintiff] was arrested . . . [and] incarcerated for three days and subsequently paid a bond [of] $2,500."  (Id. at 8.) Plaintiff twice "requested to speak to [a] supervising officer at the Office of Public Safety and Community Supervision about the [disputed] drug tests" (id. at 8) but received denials "[b]oth times" (id.).  After "a third false positive [result] for methamphetamine" (id.), Plaintiff "requested that the results be sent to a laboratory for confirmation testing" (id. at 8-9). Plaintiff later learned from "someone . . . that they had opted to classify the results as negative due to the test line being very faint" (id. at 9), leading her to "realiz[e] that the test results were being misinterpreted" (id.).  (See also id. ("[T]he control line[ ] confirms the test's functionality, and the test line[ ] appears when the substance or drug in question is NOT

3

detected.  The presence of any line in the position of the test line, no matter how faint, signifies a negative result.").)

The Original Complaint alleges that, throughout her probation, multiple probation officers and judges denied Plaintiff the opportunity to challenge the drug test results.  (See id. at 4-9, 16-17, 19, 21-22.)  The Original Complaint further alleges that, between April 2021 and August 2021, Plaintiff received "four [ ] incorrect" results on eight drug tests (id. at 19), all of which "B&D Behavioral Health . . . administered" (id. at 18).  Plaintiff thereafter allegedly "asked to have [her] drug tests administered by a [different] laboratory" (id. at 19) because B&D Behavioral Health "[was] not compliant with standard drug testing procedures" (id. at 20), and "on August 20, 2021, AnyLabTest Now began administering [Plaintiff's] drug tests" (id. at 19; see also id. at 22 ("To this date, I have taken fifteen drug tests with AnyLabTest Now[, f]ourteen [of which] were negative and one [ ] positive for THC . . . due to my use of CBD . . . .")).

As for Plaintiff's Section 1983 claim, the Original Complaint alleges that "[Durham] County unlawfully deprived Plaintiff of her liberty interests without due process and equal protections of the law" (id. at 25) by "intentional[ly] interfer[ing] with the custody and companionship of [her] two minor children" (id. at 1). Specifically, the Original Complaint alleges:

> When [Plaintiff] was arrested on January 13, 2021,
> [her] two children were with [her].  Officer Bridwell [of

4

the Durham Police Department ("DPD")] was the only officer [Plaintiff] communicated with directly that night. [DPD] Officer Park had pulled in to assist Officer Bridwell no more than 30 minutes after he arrived. [Plaintiff] was asked by Officer Bridwell if [she] had someone to call who could come get [the] children. [Plaintiff] said yes and explained that [she] would either need to charge [her] phone because the battery had died or use one of the[ officers'] phones to make the call. Immediately afterwards, he walked over to Officer Park and spoke to her. After having a brief conversation that [Plaintiff] was not able to hear, Officer Park proceeded to get [the] children out of the car and [Plaintiff] was never given the chance to call anyone. [Plaintiff] was not able to console [her] children or explain anything to them. Officer Park helped them out of the car, carrying [Plaintiff's] son who was crying while reaching out for [Plaintiff,] and [her] daughter walked beside [Officer Park] looking confused and scared. She put them in her patrol car and pulled off while Officer Bridwell waited until they were out of sight to cuff [Plaintiff] and take [her] into custody. . . . [Plaintiff] was charged with breaking and entering a motor vehicle . . . [and] possession of stolen property . . . .

(Id. at 11-12; see also id. at 12-14 (alleging procedural deficiencies in pre-trial criminal proceedings and plea agreement).)

Next, the Original Complaint alleges various "due process" (id. at 25) violations arising from Plaintiff's child custody proceedings, beginning with "emergency custody hearings" (id. at 14) wherein "[Plaintiff] was not permitted to be present or heard . . . due to Durham County's practices and procedures during the pandemic" (id.). Later, at "a hearing to determine the need to continue out of home placement for [Plaintiff's] children after [she] was released from incarceration" (id.), the Original

5

Complaint alleges that "[t]he judge immediately decided that unsecured custody would continue, giving [Plaintiff] no opportunity to speak" (id. at 15).  The Original Complaint continues:

> The adjudication hearing for neglect and dependency began on December 16, 2021, after [Plaintiff's] children had been in foster care for 337 days, and was concluded on January 10, 2022.  The hearings were held virtually due to the pandemic.  The disposition hearing took place on April 20, 2022[,] and was also held virtually.  There was no way to confidentiality [sic] communicate with one's attorney during virtual hearings, which made cross examination impossible and hindered the effective assistance of counsel.  After the hearings, [Plaintiff] found a document online that describe[d] Durham County's procedures to communicate with one's attorney in virtual proceedings by way of text message or email, but no instruction on this was ever given and, even if it had been, there was no procedure to accommodate it during hearings.

> The [DPD] officer who took [Plaintiff's] children the night of [her] arrest, [Officer] Park, accused [Plaintiff] of being under the influence on the night of [her] arrest and falsified several other statements about what happened that night, none of which [Plaintiff] could disprove.  Every single statement Officer Park attested to was a lie . . . .  The allegations of impairment were made after Officer Park communicated with the social worker who took [Plaintiff's] children into emergency custody.  There was no opportunity given to [Plaintiff] to speak[,] and when [Plaintiff] tried to at least explain that the probation violations were caused by false positive test results, the assistant district attorney prosecuting the case responded by stating he did not belief that to be true followed by the judge agreeing with him. . . .

> [Plaintiff's] children were adjudicated to be neglected and dependent due to [her] inability to care for them when [she] was incarcerated and alleged ongoing substance abuse issues in relation to the two false positive drug tests that resulted in probation violations and the testimony of Officer Park.

6

(Id. at 15-17 (internal quotation marks and some paragraph breaks omitted).)

The Original Complaint further alleges that, during a "permanency hearing . . . on September 14, 2022" (id. at 20), "the results for two [ ] of three drug tests [Plaintiff] had taken with AnyLabTest Now were reported incorrectly" (id.), that "the only way to communicate with one's attorney during the virtual hearing[] was by text message or email" (id. at 21), and that "[t]he social worker for [Durham County Family Services, or] DCFS testified that the recommendations were changed from reunification to adoption due to [Plaintiff's] lack of progress [with] court orders" (id.). Additionally, the Original Complaint alleges that "[Plaintiff] was not informed that [she] could appeal [the] permanency judgment . . . ." (Id.)

Concluding, the Original Complaint alleges:

[Plaintiff's] children are still in foster care and [she is] in the process of reuniting with them after nearly 4 years. If any of four judges had not acted in reckless disregard of the law and the unjustified harm they knowingly may cause another human being, for the purpose of what [Plaintiff] believe[s] is the disposal of cases as quickly as possible, then this could have been prevented or, at the very least, ended at a [sic] earlier point in time and saved [Plaintiff's] family from enduring so much pain. The judicial culture or customs of Durham County, in addition to inadequate drug testing, was the reason [Plaintiff's] known past of addiction was able to be used as a ploy to cover up police misconduct and to discriminate against [her]. . . . The singular most significant and objective point of evidence lies in the drug test results. If two rapid result drug tests and the testimony of a police officer can be explained enough to substantiate a claim, under a standard of clear

7

> and convincing evidence, as to alleged ongoing substance abuse issues that are the underlying cause of child dependency and neglect, then fifteen drug tests administered by a laboratory should comprehensively substantiate a claim to the contrary under a standard of a preponderance of evidence.

(Id. at 23 (paragraph break omitted).)

Durham County moved to dismiss the Original Complaint "pursuant to . . . [inter alia] Fed[eral] R[ule of] Civ[il] P[rocedure] (the 'Rules') . . . 12(b)(1)[ ] and (6) . . . for lack of subject matter jurisdiction . . . and failure to state a claim upon which relief can be granted." (Docket Entry 9 at 1). The Court (per the undersigned) "grant[ed Plaintiff's] Motion to Accept Late Filing of Plaintiff's Reply" (Text Order dated Oct. 1, 2025) and "accept[ed an e]xhibit [attached to that motion] (see Docket Entry 13-2) as Plaintiff's response to [the Dismissal] Motion" (id.). Via the Amendment Motion, Plaintiff thereafter sought "leave to amend the [Original] Complaint" (Docket Entry 14 at 1) and attached thereto a proposed "Amended Complaint" (Docket Entry 14-2 (the "Amended Complaint") at 2).

The Amended Complaint, which retains Durham County as a defendant and "seeks a preliminary injunction for the limited purpose of preventing any further action towards terminating [Plaintiff's] parental rights . . . [and] compensatory [ ] and punitive damages" (id. at 3), attempts to add several parties and causes of action. To start, the Amended Complaint (A) seeks to proceed "on behalf of [Plaintiff] and on behalf of her two minor

8

children, A.A. 1 and A.A. 2" (id.) against Durham County; "the City of Durham; . . . [Officer] Parks, police officer for the [C]ity of Durham [in her o]fficial capacity; [and] Robin Martinek ('Defendant Martinek'), Assistant District Attorney for Durham County and attorney for the Department of Social Services of Durham County [in her o]fficial capacity (collectively, the 'Defendants')" (id. (internal parentheses omitted)), and (B) asserts five causes of action (see id. at 12-20).

First, "A.A.1 and A.A.2, through their parent, Plaintiff, bring [a] claim pursuant to [Section] 1983 . . . [for] violation[s] of the Fourth and Fourteenth Amendments" (id. at 13) against the City of Durham for its "warrantless seizures of A.A.1 and A.A.2" (id.). Second, "Plaintiff [ ] brings [a] claim pursuant to [Section] 1983 [against Defendants for the] deprivation of [her] parental rights to care, custody, and control of A.A.1 and A.A.2 without due process of law under the Fourteenth Amendment" (id. at 14) arising from her "child custody cases" (id.) and "the seizure of her children from her custody without prior notice or an opportunity to be heard before a neutral decision maker . . . in the absence of an imminent danger to the[ir] health and safety" (id. at 15). Third, "Plaintiff[, ] A.A. 1, and A.A. 2 bring [a] claim pursuant to [Section] 1983" (id. at 16) against the City of Durham "which, through its agents, violated the right of Plaintiff[ and her children] . . . against unreasonable searches

9

and seizures under the [ ] Fourth and Fourteenth Amendments" (id.).
Fourth, the Amended Complaint alleges that the "City[ of Durham],
through its agents, violated [Plaintiff's] right . . . to due
process of law by depriving her of the right to the care, custody,
and control of her children . . . without first providing her with
notice and a fair hearing before a neutral decision maker under the
Fourteenth Amendment and [Section] 1983" (id. at 17-18).  Fifth,
the Amended Complaint alleges that "Defendants failed to reasonably
modify [their] policies, practices, and procedures when necessary
to avoid discrimination, [ ] causing Plaintiff to be subjected to
discrimination and denied the equal benefit of [ ] services,
programs, or activities in violation of the [ADA]" (id. at 19),
citing "not only [ ] discrimination on the basis of [Plaintiff's]
illegal use of drugs, but also [ ] discrimination based on [o]pioid
[u]se [d]isorder" (id. at 20; see also id. at 5 ("In 2015 . . . I
continued on my prescribed medication for [o]pioid [u]se [d]isorder
. . . ."); Docket Entry 1 at 2 (alleging past "physical dependence"
on opioids and "withdrawal symptoms")).

More broadly, the Amended Complaint contains allegations
substantially similar to those alleged in the Original Complaint
(collectively, the "Complaints"), including multiple "false
positive [drug test] results for methamphetamine" (Docket Entry 14-
2 at 6) during Plaintiff's probation (see id.), "Officer Parks['s
seizure of Plaintiff's] children" (id. at 7), and Plaintiff's

10

grievances regarding her children's "hearing for neglect and dependency" (<u>id.</u> at 10; <u>see also</u> <u>id.</u> at 8 (alleging that "Durham Department of Social Services filed a petition for dependency and neglect[ based on] . . . falsified statements"), 10-12 ("[At t]he adjudication hearing for neglect and dependency[,] . . . [Defendant] Martinek[] coached Officer Park . . . [and Plaintiff's] probation officer to [testify] falsely[,] . . . [s]tatements about [Plaintiff's] prescribed medications were misrepresented as a positive drug test[,] . . . [and] Defendants made misleading statements of fact as to [Plaintiff's] family members[,] . . . housing[,] . . . [and her] decision for [her] and [her] two children to stay at a friend's home for a month . . . .")).

Opposing the Amendment Motion (<u>see</u> Docket Entry 16), Durham County contends that "the [ A]mended [C]omplaint is futile because it does not cure the deficiencies in the [O]riginal [C]omplaint . . . [but] adds new deficiencies, . . . [such as] Plaintiff['s] holding herself out as her children's legal counsel" (Docket Entry 17 at 4-5) and "collateral[ly] attack[ing ] a state court order" (<u>id.</u> at 5), thereby implicating multiple "abstention doctrines" (<u>id.</u>), including "the <u>Rooker-Feldman</u> doctrine" (<u>id.</u> (italics omitted)). As such, Durham County "requests th[e] Court [ ] deny th[e Amendment M]otion . . . [because it would] replace one complaint lacking merit with an equally baseless complaint." (<u>Id.</u> at 6.)

11

## DISCUSSION

### A.  Relevant Procedural Standards

Plaintiff "moves this Court for leave to amend the [Original] Complaint" (Docket Entry 14 at 1) "pursuant to Rule 15" (id. at 2), whereas Durham County opposes the Amendment Motion (see Docket Entry 16) and seeks dismissal of the Original Complaint "pursuant to [inter alia] Rule[] . . . 12(b)(6)" (Docket Entry 10 at 11). "Although Rule 15(a)(2) provides that '[t]he [C]ourt should freely give leave when justice so requires,' futility of the amendment is one basis for denying such leave." Belcher v. W.C. Eng. Inc., 125 F. Supp. 3d 544, 550 (M.D.N.C. 2015).  "An amendment is futile if the amended claim[s] would fail to survive a motion to dismiss pursuant to [Rule] 12(b)(6)."  Hall v. Greystar Mgmt. Servs., L.P., 637 F. App'x 93, 97 (4th Cir. 2016).

"To survive a motion to dismiss pursuant to Rule 12(b)(6), plaintiffs' '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudging their claims across the line from conceivable to plausible.'"  Aziz v. Alcolac, 658 F.3d 388, 391 (4th Cir. 2011) (internal brackets omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Although the Court must accept the material facts alleged in a complaint as true, see Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999), statements of bare legal conclusions "are not entitled to the assumption of truth," Ashcroft v. Iqbal, 556

12

U.S. 662, 679 (2009), and do not sufficiently state a claim, <u>see</u> <u>id.</u>  To that end, the pleadings of pro se litigants, while liberally construed, <u>see</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007), must contain factual allegations beyond mere "labels and conclusions," <u>Twombly</u>, 550 U.S. at 555.

### B.  Analysis

### 1.  Rooker-Feldman

Durham County contends that "[the Original C]omplaint and [the A]mended [C]omplaint [contain] prohibited collateral attacks on a state court order . . . [u]nder the <u>Rooker-Feldman</u> doctrine . . . ."  (Docket Entry 17 at 5 (italics omitted).)  "Because the *Rooker-Feldman* doctrine is jurisdictional, [the Court must] address it before proceeding further . . . ."  <u>Friedman's, Inc. v. Dunlap</u>, 290 F.3d 191, 196 (4th Cir. 2002).

The <u>Rooker-Feldman</u> doctrine precludes a federal district court from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those arguments."  <u>Exxon Mobil v. Saudi</u> <u>Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005).  It applies where: "(1) the federal court plaintiff lost in state court; (2) the plaintiff complains of 'injuries caused by state-court judgments;' (3) the state court judgment became final before the proceedings in federal court commenced; and (4) the federal plaintiff 'invites

13

district court review and rejection of those judgments.'" <u>Willner v. Frey</u>, 243 F. App'x 744, 746 (4th Cir. 2007) (brackets omitted) (quoting <u>Exxon</u>, 544 U.S. at 284). "[I]f the state-court loser seeks redress in the federal district court for the injury caused by the state-court decision, his federal claim is, by definition, 'inextricably intertwined' with the state-court decision, and is therefore outside of the jurisdiction of the federal district court." <u>Davani v. Virginia Dep't of Transp.</u>, 434 F.3d 712, 719 (4th Cir. 2006).

"The *Rooker-Feldman* doctrine is frequently applied in matters where federal courts are asked to consider child custody matters previously ruled upon by state courts." <u>Monk v. North Carolina</u>, No. 5:12cv706, 2013 WL 2635222, at *2 (E.D.N.C. June 12, 2013). "In North Carolina, child abuse and neglect cases are generally the province of the state courts," <u>Wood v. Mecklenburg Cnty. Dep't of Soc. Servs.</u>, No. 3:07cv273, 2008 WL 3876174, at *7 (W.D.N.C. Aug. 18, 2008), wherein the State's district courts retain "exclusive, original jurisdiction over any case involving a juvenile who is alleged to be abused, neglected or dependent," N.C. Gen. Stat. § 7B-200. As summarized by the North Carolina Supreme Court,

> juvenile abuse, neglect, and dependency actions are governed by Chapter 7B of the General Statutes, commonly known as the Juvenile Code. Such cases are typically initiated when the local department of social services (DSS) receives a report indicating a child may be in need of protective services. DSS conducts an investigation,

14

> and if the allegations in the report are substantiated, it files a petition in district court alleging abuse, dependency, or neglect.
>
> The first stage in such proceedings is the adjudicatory hearing. If DSS presents clear and convincing evidence of the allegations in the petition, the trial court will adjudicate the child as an abused, neglected, or dependent juvenile. . . . Immediately following adjudication, the trial court must conduct a dispositional hearing. At the hearing, the trial court receives evidence and enters a written order specifying an appropriate plan to meet the needs of the juvenile. If the trial court finds it is in the juvenile's best interests, it may place the juvenile in out-of-home care. If custody of the child is removed from the parent, the trial court must hold a custody review hearing within ninety days and then again within six months. Under certain circumstances in abuse, neglect and dependency actions, DSS may file a motion for termination of parental rights.

In re A.K., 360 N.C. 449, 454-55, 628 S.E.2d 753, 756-57 (2006) (citations and internal paragraph breaks omitted). Following "an adjudication of neglect, abuse, or dependency[,] . . . a parent, [ ] guardian, or custodian who is a non-prevailing party may bring an appeal." In re. T.B., 200 N.C. App. 739, 742, 685 S.E.2d 529, 532 (2009).

Here, Plaintiff seeks redress for injuries related to multiple, adverse state court judgments from which she failed to appeal. The Court, therefore, lacks jurisdiction over any of Plaintiff's claims "to the extent [they] seek[] to [ ] enjoin the state court judgments relating to the juvenile proceedings . . . and the custody issues respecting [Plaintiff's] children, [as] those claims have been irrevocably resolved by the North Carolina

15

[c]ourts and are barred by the *Rooker-Feldman* doctrine." <u>Stratton v. Mecklenburg Cnty. Dep't of Soc. Servs.</u>, 521 F. App'x 278, 290 (4th Cir. 2013); <u>see also</u> <u>Stratton v. City of Kannapolis</u>, No. 1:23cv95, 2025 WL 1009662, at \*7 n.8 (M.D.N.C. Jan. 4, 2025) ("Indeed, any attempt by Plaintiff to ask this Court to review and vacate the state guardianship and custody order at the heart of this case would be barred by the <u>Rooker-Feldman</u> doctrine . . . ."), <u>recommendation adopted</u>, 2025 WL 1009391 (M.D.N.C. Mar. 24, 2025), <u>aff'd</u>, No. 25-1342, 2025 WL 2438181 (4th Cir. Aug. 25, 2025). That jurisdictional bar applies to the Original Complaint's allegations regarding "emergency custody hearings" (Docket Entry 1 at 14), "a hearing to determine the need to continue out of home placement for [Plaintiff's] children" (<u>id.</u>), "[t]he adjudication hearing for neglect and dependency" (<u>id.</u> at 15), "[t]he disposition hearing" (<u>id.</u>), and ["t]he permanency hearing" (<u>id.</u> at 20), along with the Amended Complaint's similar objections to "[t]he adjudication hearing for neglect and dependency" (Docket Entry 14-2 at 10).

Likewise, any requests for monetary "damages" (Docket Entry 1 at 26; <u>accord</u> Docket Entry 14-2 at 21) arising from Plaintiff's state court proceedings "relate directly to and are inextriabl[y] intertwined with the state court custody [proceedings]," <u>Stephens v. North Carolina</u>, No. 3:18cv72, 2018 WL 7317065, at \*3 (W.D.N.C. July 5, 2018), <u>recommendation adopted</u>, 2019 WL 169685 (W.D.N.C. Jan. 11, 2019), rendering them beyond the Court's

16

jurisdiction.  See also Quinn v. Cumberland Cnty., No. 5:23cv46, 2023 WL 6810536, at *2 (E.D.N.C. Oct. 16, 2023) ("[A]ny assertion raised in the [ ] complaint which was not specifically addressed by the state courts is plainly inextricably intertwined with those arguments already considered as, to prevail in this case, [the] plaintiff seeks a decision which would render the judgment of the North Carolina Supreme Court [affirming custody and parental rights determinations] ineffectual."), aff'd, No. 23-2170, 2024 WL 2815073 (4th Cir. June 3, 2024); Stratton, 521 F. App'x at 291 (classifying Section 1983 due process claim regarding custody and parental rights determinations as "a mere pretext for the real focus of the [c]omplaint, which challenge[d] the validity of records and proceedings of the North Carolina courts").[2]

---

2   Relatedly, to the extent the Amended Complaint's request for "a preliminary injunction . . . preventing any further action towards terminating [Plaintiff's] parental rights" (Docket Entry 14-2 at 3) refers to an actual, ongoing termination proceeding, the Court should abstain from granting such relief "under the principles of federalism enunciated in *Younger v. Harris*, 401 U.S. 37 (1971)," Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 10 (1987) (parallel citation omitted).  Plaintiff has not alleged the existence of an ongoing termination proceeding (see Docket Entry 1 at 20 (noting "permanency hearing . . . on September 14, 2022" as most recent state court proceeding)); should one exist, however, the granting of Plaintiff's request for a preliminary injunction "would call into question the validity of [any] state court [termination] proceeding[] and would significantly interfere with [such a] proceeding[]," Betts v. Armstrong, No. 1:25cv341, 2025 WL 1436051, at *4 (M.D.N.C. May 5, 2025) (internal quotation marks omitted), recommendation adopted, 2025 WL 1435105 (M.D.N.C. May 19, 2025), aff'd No. 25-1607, 2025 WL 2438193 (4th Cir. Aug. 25, 2025). Furthermore, in the event of a termination proceeding, "Plaintiff [would have] an adequate state forum in which to pursue any viable (continued...)

### 2. Claims on Behalf of Plaintiff's Children

Next, Plaintiff (who proceeds pro se) pursues two claims against the City of Durham "on behalf of [her] two minor children" (Docket Entry 14-2 at 3; see also id. at 12-13, 16-17 (asserting deprivations of children's Fourth and Fourteenth Amendment rights under Section 1983)). "An individual unquestionably has the right to litigate h[er] *own* claims in federal court. . . . The right to litigate for *oneself*, however, does not create a coordinate right to litigate for *others*." Myers v. Loudoun Cnty. Pub. Schs., 418 F.3d 395, 400 (4th Cir. 2005). In particular, "non-attorney parents generally may not litigate the claims of their minor children in federal court." Id. at 401; see also id. ("[This rule] ensures the children's interests are not prejudiced by their well-meaning, but legally untrained parents."). Accordingly, because Plaintiff cannot bring suit on behalf of her minor children without legal representation, the Court should find the Amended Complaint's claims on behalf of Plaintiff's children futile.

### 3. Official Capacity Claims

The Amended Complaint also brings two claims against Officer Parks and Defendant Martinek in their "[o]fficial capacit[ies]" (Docket Entry 14-2 at 3 (internal parentheses omitted)): first, a

2(...continued)
federal constitutional claims, and [the Complaints] fail[ ] to show that an exception to the *Younger* abstention [doctrine would] appl[y]." Id. (citation, internal quotation marks, and brackets omitted).

18

claim "pursuant to [Section] 1983 [for the] deprivation of [Plainiff's] parental rights" (id. at 14) and second, an ADA claim for "discrimination against [ ] Plaintiff on the basis of her disability" (id. at 19). Both claims also purportedly seek redress "[a]gainst all [D]efendants" (id. (emphasis added); accord id. at 14), including Durham County and the City of Durham (see id. at 3).

Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)). "Because an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity, official-capacity claims should be dismissed as duplicative when the entity is also named as a defendant." Nance v. City of Albermarle, 520 F. Supp. 3d 758, 778 (M.D.N.C. 2021) (internal quotation marks and citation omitted). Here, both of the Amended Complaint's official capacity claims against Officer Parks and Defendant Martinek apply equally to their respective employers, the City of Durham and Durham County. (See Docket Entry 14-2 at 14, 19.) As such, the Court should find Plaintiff's official capacity claims duplicative and therefore futile.[3]

---

[3] To the extent Plaintiff seeks to hold Defendants responsible for the actions of each other's employees, "in North Carolina, counties (like [Durham] County) and cities (like the City of [Durham]) constitute separate political subdivisions, such that (continued...)

### 4. Section 1983 Claims

The Complaints present several Section 1983 claims against Durham County and the City of Durham, all of which fail to state a claim.

Under Section 1983, "a municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691. "Only in cases where the municipality causes the deprivation 'through an official policy or custom' will liability attach." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). "Because [S]ection 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the 'official policy' requirement was 'intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby to make clear that municipal liability is limited to action for which the municipality is actually responsible.'" Riddick v. School Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)).

---

3(...continued)
[Durham] County has no authority over an employee of the City of [Durham]," Hall El v. Craven, No. 1:12cv246, 2012 WL 1067627, at *6 n.6 (M.D.N.C. Mar. 30, 2012) (citation and parentheses omitted), recommendation adopted, 2013 WL 1749906 (M.D.N.C. Apr. 23, 2013).

20

"To state a cause of action against a municipality, a [S]ection 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008). Moreover, a plaintiff must identify the municipal policy with precision; "[u]nfocused evidence of unrelated constitutional violations is simply not relevant to the question of whether a municipal decisionmaker caused the violation of the specific federal rights of the plaintiff before the court." Carter, 164 F.3d at 218-19. "Municipal policy may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." Id. at 218 (citations omitted). Additionally, "municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a 'custom or usage' with the force of law." Id. (some internal quotation marks omitted). However, "plaintiffs asserting an unconstitutional custom [ ] under *Monell* must at least allege *some* facts supporting [its] existence . . . beyond mere labels and conclusions." Harris v. Piedmont Reg'l Jail Auth., No.

21

3:24cv799, 2025 WL 2581839, at *11 (E.D. Va. Sept. 5, 2025) (internal quotation marks omitted).

Here, neither of the Complaints successfully pleads the existence of a specific policy or custom fairly attributable to Durham County or the City of Durham which proximately caused a deprivation of Plaintiff's constitutional rights. To start, the Original Complaint's Section 1983 claim seeks to hold "[Durham] County [ ] responsible for the repeated infringement of [Plaintiff's] right to procedural due process and for the intentional interference with the custody and companionship of [her] two minor children" (Docket Entry 1 at 1). Yet, despite detailing the shortcomings of Plaintiff's probationary drug testing procedures at length (see id. at 4-6, 8-9, 18-20, 22, 23), the Original Complaint fails to attribute any of those shortcomings to Durham County, much less a specific Durham County policy or custom. (See, e.g., id. at 19 (alleging drug tests administered by third parties not controlled by Durham County).) The Original Complaint's allegations regarding the removal of Plaintiff's children from her custody during her arrest (see id. at 11-12), as well as her allegedly unfair criminal process (see id. at 6-8, 10-14), all suffer from the same basic deficiency, as they represent, at best, "[u]nfocused [allegations] of unrelated constitutional violations . . . [ir]relevant to the question of whether a [Durham

22

County] decisionmaker caused the violation of [Plaintiff's] specific federal rights," Carter, 164 F.3d at 218-19.[4]

The Amended Complaint's Section 1983 claim against Durham County and the City of Durham (see Docket Entry 14-2 at 14-16) fails for similar reasons. That claim seeks redress for "[the d]eprivation of [Plaintiff's] parental rights without due process" (id. at 14) and specifically accuses Defendants of "seiz[ing Plaintiff's] children from her custody without prior notice or an opportunity to be heard before a neutral decision maker" (id. at 15). But the Amended Complaint fails to attribute that seizure to (A) Durham County in any way or (B) any official policy or custom of the City of Durham, despite alleging misconduct on the part of its police officers (see id. at 6-7). Standing alone, those allegations represent only a failed attempt to hold the City of Durham "liable by application of the doctrine of *respondeat superior*," Pembaur, 475 U.S. at 478.

The Amended Complaint's remaining Section 1983 claims against the City of Durham — both styled as "Monell claim[s]" (Docket Entry 14-2 at 16; accord id. at 17) — contain only conclusory allegations

---

4 The Original Complaint also references a "judicial culture or custom[] of Durham County" (Docket Entry 1 at 23) to "dispos[e] of cases as quickly as possible" (id.) without alleging any specific judge's affiliation with Durham County and despite the fact that the State of North Carolina (not its counties) employs state judges, see Hall El, 2012 WL 1067627, at *6 n.6. In any event, this Court lacks jurisdiction to hear Plaintiff's grievances over her state court proceedings.

23

of an official policy or custom. As to both claims, the alleged constitutional violations "caused by the policies, customs, and established practices, including inadequate training and supervision, of the City of Durham" (id. at 16; accord id. at 18) amount to little more than "boilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does [in fact] exist," Boliek v. Frendlich, No. Civ. 04-3655, 2005 WL 1363980, at *6 (D. Md. June 7, 2005) (internal brackets and quotation marks omitted). For example, the first "Monell claim" (Docket Entry 14-2 at 16) alleges "a custom, policy, and practice of the unreasonable seizure of a child without a warrant or a judicially recognized exception to the warrant requirement" (id.) without also alleging that policy's basis in existing "ordinances[, ] regulations, . . . [or ] affirmative decisions or [deliberately indifferent] omissions on the part of policymaking officials," Carter, 164 F.3d at 218 (citations omitted). Likewise, the second "Monell [c]laim" (Docket Entry 14-2 at 17) alleges that the City of Durham "failed to train its officers [on the requirements of] procedural due process" (id. at 18), resulting in the "remov[al of] Plaintiff's children without a noticed fair hearing" (id.). But, "[w]hen a plaintiff asserts a [Section 1983] claim based on inadequate training, the complaint should contain facts revealing[] the nature of the training, that the training was a deliberate or conscious choice by the municipality, and that the

24

officer's conduct resulted from said training," Smith v. City of Greensboro, No. 1:19cv386, 2020 WL 1452114, at *11 (M.D.N.C. Mar. 25, 2020) (parentheses and internal quotation marks omitted), none of which appear in the Amended Complaint.  See also Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987) (requiring the plaintiff to demonstrate a "specific deficiency rather than general laxness or ineffectiveness in training").

Accordingly, the Court should grant the Dismissal Motion as to the Original Complaint's Section 1983 claim against Durham County and find the Amended Complaint's Section 1983 claims against Defendants futile.

### 5.  ADA Claims

Finally, the Original Complaint pursues a claim under Title II of the ADA against Durham County (see Docket Entry 1 at 24-25), which the Amended Complaint re-alleges against Defendants (see Docket Entry 14-2 at 19-20).

"Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'"  National Fed'n of the Blind v. Lamone, 813 F.3d 494, 502 (4th Cir. 2016) (quoting 42 U.S.C.

25

§ 12132).[5] "Title II also imposes [on public entities] an affirmative obligation to make 'reasonable modifications to rules, policies, or practices . . .' to enable disabled persons to receive services or participate in programs or activities." <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 488 (4th Cir. 2005) (quoting 42 U.S.C. § 12131(2)). "To make out a violation of Title II, plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." <u>National Fed'n of the Blind</u>, 813 F.3d at 502-03; <u>see also</u> 42 U.S.C. § 12132. As to the first element, "[a] plaintiff must make th[e] threshold showing [of disability] before he or she can even invoke the nondiscrimination provisions of the statute," <u>Constantine</u>, 411 F.3d at 488, which defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment," 42 U.S.C. § 12102(1). A plaintiff also must show that her disability "played a motivating

---

5 Public entities under Title II "includ[e s]tate and local governments and their departments, agencies, or instrumentalities," <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 488 (4th Cir. 2005) (citing 42 U.S.C. § 12131(1)).

26

role" in the challenged action.  Constantine, 411 F.3d at 498 n.17 (internal quotation marks omitted).

Here, neither of the Complaints sufficiently alleges a "disability" within the meaning of the ADA.  The Complaints accuse Defendants of "failing to make reasonable modifications to [their drug testing] policies" (Docket Entry 1 at 24) to accommodate Plaintiff's "medication for the treatment of ADHD" (id. at 4; accord Docket Entry 14-2 at 6) and "discrimination based on [Plaintiff's o]pioid [u]se [d]isorder" (Docket Entry 14-2 at 20). Properly alleged, either disorder may form the basis of an ADA claim.  See e.g., Halig v. National Bd. of Exam'rs of Optometry, Inc., No. CV 22-2118, 2024 WL 3253561, at *12 (D. Md. July 1, 2024) ("ADHD and other learning disabilities can be, but are not always, qualifying disabilities under the ADA."); Taylor v. Wexford Health Sources, Inc., No. 2:23cv475, 2024 WL 38555, at *5 (S.D. W. Va. Jan. 3, 2024) ("Opioid use disorder is a qualifying disability for purposes of the ADA . . . .").  But aside from alleging that Plaintiff received medication for both disorders (see Docket Entry 1 at 3, 4; accord Docket Entry 14-2 at 5, 6) after unspecified "withdrawal symptoms" (Docket Entry 1 at 2) and that she has "abst[ained] from all illicit drugs [besides marijuana] . . . since 2013" (id. at 3; accord Docket Entry 14-2 at 5), the Complaints do not allege that her disorders "substantially limit[ed her] . . . major life activities," 42 U.S.C. § 12102(1), "at the time of the

27

[alleged] benefits denial," <u>Byrd v. NC Dep't of Health & Hum. Servs.</u>, No. 1:23cv320, 2024 WL 624047, at *5 (M.D.N.C. Feb. 14, 2024), <u>recommendation adopted</u>, 2024 WL 5704630 (M.D.N.C. Mar. 12, 2024).  <u>See also</u> <u>Rudolph v. Buncombe Cnty. Gov't</u>, 846 F. Supp. 2d 461, 472 (W.D.N.C. 2012) ("Mere receipt of medical treatment [is] insufficient to create record [of disability] without showing the condition substantially limited [a] major life activity . . . ."), <u>aff'd</u>, 474 F. App'x 931 (4th Cir. 2012); 42 U.S.C. § 12102(2) (listing "major life activities" such as "caring for oneself, performing manual tasks, . . . [and sustaining] the operation of [ ] major bodily function[s]").  Therefore, standing alone, "Plaintiff's mere assertion[s] that . . . [s]he has [ADHD and opioid use disorder prove] insufficient to show that [s]he meets the [ADA's] definition of disability." <u>Coleman v. Prince George's Cnty. Dep't of Soc. Servs.</u>, Civ. Action No. 2009-0213, 2010 WL 917871, at *3 (D. Md. Mar. 8, 2010), <u>aff'd</u>, 414 F. App'x 514 (4th Cir. 2011).

Even "assum[ing] Plaintiff has alleged a disability, Plaintiff has not alleged that [Defendants] denied [her] participation in or the benefits of any [ ] services, programs, or activities that [s]he would otherwise be qualified for absent [a] disability, or that any such exclusion or denial was because of [a] disability." <u>Rosado v. Langdon</u>, No. 1:24cv108, 2024 WL 2967345, at *7 (W.D.N.C. June 12, 2024).  Instead, Plaintiff complains of drug testing

28

procedures during her probation (see Docket Entry 1 at 4-7, 8-9, 18-20, 22; Docket Entry 14-2 at 6) without alleging that Defendants oversaw those procedures or, for that matter, any part of her probation. (Compare, e.g., Docket Entry 1 at 19 (noting drug tests "conducted by B&D Behavioral Health" and "AnyLabTest Now"), with id. at 24 (alleging Durham County "withh[eld] confirmatory testing").)[6] The Original Complaint leaves equally unclear the cause of Plaintiff's failed drug tests, alleging on the one hand that Plaintiff's ADHD medication triggered "false positives" (id. at 5) and on the other that her "results were being misinterpreted" (id. at 9) as positive when "the test line['s ] very faint [appearance]" (id.) indicated negative results (see id.). Construed in a light most favorable to Plaintiff, the Complaints "offer[] no allegations of discrimination. Nor does [P]laintiff adequately allege that [s]he was denied benefits on the basis of [a] disability." Zelaya Sorto v. Doe, Civ. Action No. 5:18 3242, 2020 WL 5709249, at *6 (E.D.N.C. Sept. 24, 2020), aff'd

---

6 Similarly, the Original Complaint alleges that Plaintiff attempted "to speak to [a] supervising officer at the Office of Public Safety and Community Supervision about the [disputed] drug tests." (Docket Entry 1 at 8.) To the extent that allegation refers to the Division of Community Supervision and Reentry, which receives "person[s] released from incarceration [ ] in[to its] custody," N.C. Gen. Stat. § 15A-1368(a)(2), it complains of conduct by an entity under the authority of the State of North Carolina's Department of Adult Correction, see id., not Durham County or the City of Durham.

29

sub nom., Sorto v. Doe, No. 21-7466, 2022 WL 3210705 (4th Cir. Aug. 9, 2022).

Similarly, the allegation that Defendants "discriminated [against Plaintiff by] . . . erroneously regard[ing] her as [an illegal drug] use[r]" (Docket Entry 1 at 25 (citing 28 C.F.R. 35.131(a)(1)(iii)); accord Docket Entry 14-2 at 20) fails to explain exactly how Defendants made that allegedly errant assessment, or to show that it "played a motivating role" in whatever action(s) Plaintiff challenges, Constantine, 411 F.3d at 498 n.17 (internal quotation marks omitted). See also Millwood v. Tyson Foods, Inc., No. 8:23cv6004, 2024 WL 3666446, at *9-10 (D.S.C. June 14, 2024) ("To proceed under a 'regarded as' theory, the plaintiff must 'establish[] that he or she has been subjected to an action prohibited under [the ADA] . . . .'" (emphasis added) (brackets in original) (quoting 42 U.S.C. § 12102(3)(A))), recommendation adopted, 2024 WL 3593815 (D.S.C. July 31, 2024). And to the extent the Complaints challenge Defendants' actions in relation to the child custody proceedings (see, e.g., Docket Entry 1 at 23 (alleging that drug test "result[s] . . . substantiat[ing] . . . [Plaintiff's] substance abuse issues [ ] are the underlying cause of [the ] dependency and neglect [determination]")), "Plaintiff's apparent dissatifaction with [those] state court proce[edings] does not[ ] provide [her] a factual foundation for filing a complaint under the ADA," King v.

30

Mongomery Cnty. Cir. Ct., No. Civ.A 05-721, 2005 WL 4014095, at *1 (D. Md. Mar. 22, 2005), aff'd, 121 F. App'x 190 (4th Cir. 2005). See also Smith v. Leach, No. 2:20cv2853, 2020 WL 13789021, at *6 (D.S.C. Dec. 8, 2020) (citing Rooker-Feldman doctrine to conclude that "[p]laintiff may not use a civil rights action to challenge the determinations or rulings of state courts"), recommendation adopted, 2021 WL 11523153 (D.S.C. Jan. 11, 2021).

The Court should therefore grant the Dismissal Motion as to the Original Complaint's ADA claim and find the Amended Complaint's ADA claim futile.

<u>CONCLUSION</u>

The Court lacks subject-matter jurisdiction over the Complaints' claims arising from state court judgments, and the remaining allegations fail to state a claim upon which relief may be granted.

**IT IS THEREFORE RECOMMENDED** that the Court grant the Dismissal Motion (Docket Entry 9) and deny the Amendment Motion (Docket Entry 14).

This 31st day of March, 2026.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**